IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEFFREY KENGERSKI, | ) |
| | ) |
| Plaintiff, | ) 2:17-CV-1048-NR |
| | ) |
| v. | ) |
| | ) |
| ALLEGHENY COUNTY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION ON MOTION FOR SUMMARY JUDGMENT [ECF 56]

**J. Nicholas Ranjan, United States District Judge**

Plaintiff Jeffrey Kengerski was a white employee who claimed that his employer retaliated against him (fired him) when he reported certain racist comments and text messages by a co-worker.

Under Title VII, an employer cannot retaliate against an employee who opposes an "unlawful employment practice." But Mr. Kengerski's report did not concern an unlawful employment practice. He complained about a co-worker making a racist comment about his grand-niece and sending him some (supposedly funny, but obviously racist) text images of stereotypes of African-Americans and Asians. The racist comment and texts were inappropriate and offensive, and Mr. Kengerski was, no doubt, right in reporting them. But reporting a co-worker's offensive remarks is not the same as opposing an unlawful employment practice. Because Mr. Kengerski's complaint had nothing to do with an unlawful employment practice, his claim for retaliation under Title VII fails as a matter of law.

## FACTUAL BACKGROUND

### I.   Mr. Kengerski's employment, and his April 2015 letter.

Mr. Kengerski lost his job as captain at the Allegheny County Jail in November 2015 and now claims that his termination was unlawful Title VII retaliation. In particular, Mr. Kengerski claims that he was unlawfully terminated because of a letter that he wrote to the warden in April 2015, in

which he described a racially insensitive comment and text messages directed at him by another white jail employee, Ms. Robyn McCall. Ms. McCall's racist comment was about Mr. Kengerski's grand-niece, who is bi-racial, and her text messages depicted racist images of African-Americans and Asians, likening them to fellow jail employees.

More specifically, the April 29, 2015, letter to the warden began with recounting a situation, "[o]ver a year" prior, in which Ms. McCall (while she was still a captain rather than a major) asked if Mr. Kengerki's grand-niece Jaylynn was "Black" and called Jaylynn a "little monkey" when told by Mr. Kengerski that she was bi-racial. [ECF 68-35]. Mr. Kengerski asked Ms. McCall not to speak that way about his family and that "not long after" this interaction, he began receiving racially inappropriate text messages from Ms. McCall. [*Id.*].

Screenshots of the text messages were attached to Mr. Kengerski's April 2015 letter. [ECF 68-36]. They were sent between February and June 2014 and depict unflattering photographs of African-Americans and Asians, often repeating offensive stereotypes. For instance, several of the photographs depict overweight African-American women, and one of the photographs depicts an Asian woman with enlarged teeth. Some of the photographs have captions comparing them to African-American and Asian employees at the jail. [*Id.*].

After describing the situation about his grand-niece and the text messages, Mr. Kengerski's April 2015 letter stated: "I believe . . . I have been harassed and I feel my existence here at the ACJ is being threatened. At this time I feel I am in a hostile environment and will be disciplined, harassed and possibly ridiculed by Major McCall on any occasion." [ECF 68-35].

The letter went on to discuss instances of Ms. McCall's general antagonism directed at Mr. Kengerski. In particular, he stated that she unfairly accused his him of "sabotaging the training department" and that she "slandered" him and "criticized [him] in emails." [*Id.*]. He also described an issue regarding "the staff schedule and assignment" and claimed that Ms. McCall "harassed" him with regard to "staff scheduling." [*Id.*].

After receiving the letter, the warden referred Mr. Kengerski's complaint to the County law department for advice on whether Ms. McCall had violated jail policies and whether action should be taken against her. [ECF 67 ¶ 12]. While Ms. McCall was not terminated from the jail, she was placed on paid

administrative leave from May 22, 2015 through August 28, 2015, at which time she resigned. [*Id.* ¶ 16; ECF 68-9]. Mr. Kengerski claims that she was forced to resign because of his complaint. [ECF 67 ¶ 17].

## II. Mr. Kengerski's termination.

Mr. Kengerski was terminated in November 2015, over six months after he submitted the April 2015 letter to the warden. [*Id.* ¶ 1]. The parties dispute the reason for the termination.

On the one hand, the County claims that Mr. Kengerski was terminated because, in the context of a sexual harassment investigation conducted in the Fall of 2015, he told two subordinate officers to put false information in a report or to provide false information if asked. [ECF 59 at 17]. On the other hand, Mr. Kengerski claims that the County's given reason is a pretext and that, in reality, Mr. Kengerski was terminated in retaliation for his April 2015 complaint against Ms. McCall that led to her resignation. [ECF 65 at 1-2]. Mr. Kengerski claims that both the warden harbored retaliatory animus toward him, as well as other jail employees who were part of Ms. McCall's "faction" and who influenced the warden's termination decision. [*Id.* at 13-17].

On August 10, 2017, Mr. Kengerski filed the present lawsuit, alleging several employment-discrimination claims against the County and the warden. [ECF 1]. After amendments to the pleadings and motions practice, the lone remaining claim in the case is one for retaliation under Title VII against the County.

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the inquiry is whether the evidence presents "a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In making this determination, a court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

If the moving party shows a lack of genuine issue of material fact, "the non-moving party must rebut the motion with facts in the record and cannot

rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (citation omitted). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. *Celotext Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## DISCUSSION & ANALYSIS

The County makes one main argument in support of its summary-judgment motion—that Mr. Kengerski cannot establish a *prima facie* case of Title VII retaliation based on the facts in the record. The Court agrees.

### I. Title VII retaliation legal framework.

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must provide evidence that: (1) he "engaged in activity protected by Title VII"; (2) the employer took an "adverse employment action" against him; and (3) there was a "causal connection" between his "participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 341-42 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

The County concedes that Mr. Kengerski satisfies the second prong since his November 2015 termination constitutes an adverse employment action. But it disputes that Mr. Kengerski establishes either the first or third prong—that he "engaged in activity protected by Title VII" and that there was a requisite "causal connection" between the protected activity and his termination. Because the Court finds that Mr. Kengerski fails to satisfy the first prong of engaging in protected activity, Mr. Kengerski's claim fails at the outset.[1]

---

[1] Because the Court finds that Mr. Kengerski cannot demonstrate protected activity, it need not address the issue of causation. That said, there was a seven-month gap between the complaint and termination. Usually, courts will dismiss retaliation claims as a matter of law where there is such a long gap. *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment."); *Andreoli v. Gates,* 482 F.3d 641,

- 4 -

## II. Mr. Kengerski cannot establish that he engaged in activity protected by Title VII.

As for protected activity, the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the "participation clause") and those who oppose discrimination made unlawful by Title VII (the "opposition clause"). *Slagle v. County of Clarion*, 435 F.3d 262, 266 (3d Cir. 2006). Here, only the opposition clause is at issue.[2] It applies only to those who have "opposed any practice made an ***unlawful employment practice*** by this subchapter." 42 U.S.C.A. § 2000e-3(a) (emphasis added). "Therefore, the actions underlying the employee's conduct must be activity that Title VII was intended to protect." *Rossell v. County Bank*, 270 F. App'x 217, at *1 (3d Cir. 2008).

For a complaint to qualify as protected, a plaintiff must have held an objectively reasonable, good-faith belief that his employer's activity was unlawful under Title VII. He need not prove the merits of the underlying discrimination complaint, but a reasonable person must be able to conclude that there was unlawful discrimination under Title VII. *Moore*, 461 F.3d at 344; *Clark County v. Breeden*, 532 U.S. 268, 271 (2001) (rejecting retaliation claim where "[n]o reasonable person could have believed that" the underlying incident complained about "violated Title VII's standard" for unlawful discrimination); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996) (retaliation plaintiff must "act[ ] under a good faith, reasonable belief that a violation existed.") (quotations and citations omitted).

Here, from a review of the April 2015 letter, Mr. Kengerski opposed "harassment" and "inappropriate racial text messages," which he claims created a "hostile environment." Thus, construing this letter in his favor, he appears to be opposing the creation of a hostile work environment. Generally, a hostile work environment is an unlawful employment practice under Title VII. But not here. As discussed below, it was not objectively reasonable to view Ms. McCall's comment and text messages as meeting the standard for a hostile work environment.

---

650 (3d Cir. 2007) (holding five-month time period between complaint and first adverse action insufficient by itself to support inference of causation).

[2] The participation clause is specific to only those who participate in Title VII proceedings such as those who file a complaint with the EEOC or witnesses who participate in EEOC proceedings. *See Slagle*, 435 F.3d at 266.

- 5 -

### A. The was no objectively reasonable hostile work environment since Mr. Kengerski is not a member of a protected class.

Mr. Kengerski's retaliation claim fails because he could not have held an objectively reasonable, good-faith belief that he was subject to a hostile work environment[3]—mainly because he would not have had standing to bring such a claim. There is no hostile work environment experienced by the plaintiff when he is not the member of the protected class allegedly harassed. *See Moore*, 461 F.3d at 342; *Longoria v. N.J.*, 168 F. Supp. 2d 308, 318 (D.N.J. 2001) (finding that Hispanic police officer lacked standing to assert claim for hostile work environment based on racist comments directed at African-American co-workers). Mr. Kengerski is white. The hostility of which he complains was directed towards African-Americans and Asians, and therefore he would have lacked standing to bring such a claim.[4]

Any claim based on "associational" discrimination also is objectively unreasonable. Although Mr. Kengerski lacks standing to assert a hostile work environment claim, some courts (though not the Third Circuit) have recognized that a plaintiff can assert such a claim based on an association with a member of a protected class. *See Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick & GMC Trucks, Inc.*, 173 F.3d 988, 994 (6th Cir. 1999); *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986). For example, a white plaintiff can suffer from a hostile work environment when he is discriminated against in the workplace because of his marriage to an African-American. *Parr*, 791 F.2d at 892; *see also Tetro*, 173 F.3d at 994 (parent-child relationship).

---

[3] The April 2015 letter stated that Mr. Kengerski believed he was opposing a hostile work environment directed at himself. *See* [ECF 68-35 ("I believe since that time I have been harassed . . . . At this time I feel I am in a hostile environment . . . .")].

[4] To be clear, Mr. Kengerski has standing to bring a retaliation claim, even if he is not in the protected class. *Moore*, 461 F.3d at 342 ("Title VII's whistle-blower protection is not limited to those who blow the whistle on their own mistreatment or on the mistreatment of their own race, sex, or other protected class."). But since he so clearly lacks standing to assert a hostile work environment claim based on harassment directed at himself, his opposition to such a potential claim was objectively unreasonable.

But even under an associational discrimination theory, if this Court were to acknowledge it, there is no hostile work environment claim here. Associational discrimination claims arise where there is a "substantial relationship" between the plaintiff and someone of a protected class, such as a marital or parental-child relationship. *Larochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 693-94 (E.D. Pa. 2016). Mr. Kengerski has not cited any legal authority that would extend that doctrine to an association between co-workers (*i.e.,* those referenced in Ms. McCall's texts) or a relative as remote as a grand-niece (*i.e.,* the subject of Ms. McCall's "little monkey" comment). As such, it would be objectively unreasonable to believe that Mr. Kengerski suffered from a hostile work environment under an associational theory of discrimination.

### B. The comment and texts fall short of the "severe or pervasive" standard for hostile work environment claims.

Even if Mr. Kengerski had standing or associational standing, the comment and text messages fall woefully short of the standard for a hostile work environment claim. For a plaintiff to succeed on such a claim, a plaintiff must show that "1) the employee suffered intentional discrimination because of his/her race, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (cleaned up).

"The discriminatory conduct must be so extreme as to amount to a change in the terms and conditions of employment. Unless they are extremely severe, offhand comments and isolated incidents are insufficient to sustain a hostile work environment claim." *Shaw v. Temple University*, 357 F. Supp. 3d 461, 475 (E.D. Pa. 2019) (quoting *Woodard v. PHB Die Casting*, 255 F. App'x 608, 609 (3d Cir. 2007)).

"[W]hile racial slurs and epithets are reprehensible, these comments alone are generally not enough to create a hostile work environment." *James v. Tri-Way Metalworkers, Inc.*, 189 F. Supp. 3d 422, 439 (M.D. Pa. 2016). Thus, the standard for "severe or pervasive" is quite high. *See, e.g., Shaw*, 357 F. Supp. 3d at 475 (patrol officers failed to establish that co-worker's use of racial slurs in front of officers was severe or pervasive, where officers could each only point to one instance where they individually overheard co-worker using a racial slur); *James*, 189 F. Supp. 3d at 439-40 (co-worker's alleged harassment of African-American employee was not sufficiently pervasive where co-worker

and employee did not work together often, and co-worker allegedly made six racist comments over course of 11 months).

Here, Mr. Kengerski's retaliation claim fails because he has not adduced sufficient evidence that he held an objectively reasonable, good-faith belief that he was subject to a hostile work environment. The April 2015 letter opposed one racially insensitive comment and several text messages that were not "severe or pervasive" enough so that a reasonable person could conclude that they constituted a hostile work environment. *See Moore*, 461 F.3d at 344.

With respect to his grand-niece, Mr. Kengerski complained of *one instance* of Ms. McCall asking if his grand-niece was black and then calling her a "little monkey." This is, as a matter of law, insufficient to constitute hostile work environment. *See Faragher v. Boca Raton*, 524 U.S. 775, 786-87 (1998) ("Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to a hostile work environment.") (cleaned up); *Young v. St. James Mgmt.*, 749 F. Supp. 2d 281, 294 (E.D. Pa. 2010) ("even if the comments were taken to be racially offensive, three ambiguous verbal remarks to Steve about his son's girlfriend do not rise to the level of severe or pervasive racial harassment."). Thus, the April 2015 letter could not have opposed an "unlawful employment practice" since it depended on just one offhand, yet offensive, remark.

The same goes with the text messages referenced in the April 2015 letter. These text messages were sent to Mr. Kengerski by Ms. McCall between February and June 2014 and depict images of African-American and Asian people in an unflattering light, often mocking certain jail employees in the captions. As with the "little monkey" comment, these handful of text messages could not possibly rise to the level of "severe or pervasive" to constitute a hostile work environment towards Mr. Kengerski. *See Shaw*, 357 F. Supp. 3d at 475; *James*, 189 F. Supp. 3d at 439-40.

In short, Ms. McCall made a comment and sent text messages to Mr. Kengerski that were offensive, unprofessional, and even racist; still, no reasonable jury could find that Mr. Kengerski had an objectively reasonable, good-faith belief that they constituted an unlawful employment practice under Title VII.

- 9 -

## CONCLUSION

For the reasons discussed above, the County's Motion for Summary Judgment [ECF 56] will be **GRANTED**. Judgment is **ENTERED** in favor of the County, and all claims are **DISMISSED with prejudice**. An appropriate order follows.

DATED this 24th day of January, 2020.

BY THE COURT:

*/s/ J. Nicholas Ranjan*
United States District Judge